**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| NEDRA C., ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 4:20-cv-144** |
| ) | |
| KILOLO KIJAKAZI[1], ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Nedra C. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") and partially denying her claim for Supplemental Social security benefits ("SSI") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 14. Presently before the Court are the parties' cross motions for summary judgment. ECF Nos. 20, 23.

---

[1] On July 9, 2021, Kilolo Kijakazi was appointed as the Acting Commissioner of Social Security, replacing former Commissioner of Social Security Andrew Saul. Accordingly, the Court substitutes Acting Commissioner Kilolo Kijakazi for Andrew Saul in this matter pursuant to Federal Rule of Civil Procedure 25(d).

After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 20, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 23, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE.**

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed applications for DIB and SSI on May 10, 2016, alleging disability due to peripheral neuropathy in both feet, bilateral lymphemia in both legs, right shoulder injury tendinosis/tendonitis, and high blood pressure. R. at 57–58, 260, 272.[2] Plaintiff's applications were initially denied on July 22, 2016, and again denied upon reconsideration on November 3, 2016. R. at 91–92, 123–24. On December 1, 2016, Plaintiff requested a hearing before an administrative law judge. R. at 151.

A hearing was held on April 25, 2018, at which Plaintiff appeared with counsel by video before Administrative Law Judge William Pflugrath ("the ALJ"). R. at 3218–99. Both Plaintiff and an impartial vocational expert testified at the hearing. R. at 3224–99. On March 13, 2019, a supplemental hearing was held, at which Plaintiff appeared with counsel before the ALJ, for the purpose of clarifying details about additional medical records and a resume that were submitted to the Social Security Administration in support of Plaintiff's claim for disability. R. at 3118–216. On June 5, 2019, the ALJ issued a partially favorable decision, denying Plaintiff's claim for DIB because Plaintiff was not disabled through September 30, 2016 (her date last insured), but granting Plaintiff's claim for SSI because Plaintiff was disabled as of October 21, 2017. R. at 30–44.

---

[2] "R." refers to the certified administrative record that was filed under seal on May 28, 2021. ECF No. XX, pursuant to Local Civil Rules 5(B) and 7(C)(1).

Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on July 6, 2020, making the ALJ's decision the final decision of the Commissioner. R. at 1–3.

Having exhausted her administrative remedies, on September 14, 2020, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. On May 23, 2021, Plaintiff filed a motion for summary judgment and accompanying memorandum in support. ECF Nos. 20, 21. On June 22, 2021, the Commissioner filed a motion for summary judgment and brief in support. ECF Nos. 23, 24. Plaintiff did not file a reply. Because the motions are fully briefed, the matter is now ripe for recommended disposition.

## II. RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

### A. Plaintiff's Medical Records Relevant to Alleged Physical Impairments[3]

Plaintiff was fifty-three years old at the time of her alleged disability onset date of January 4, 2016, and was considered closely approaching advanced age under the Social Security Regulations. R. at 108. Throughout the relevant period, Plaintiff treated with her primary care provider, Dr. Cecila House, D.O. R. at 953. Plaintiff initially complained of worsening bilateral foot pain and swelling, which was exacerbated by standing at work. R. at 951. Dr. House noted that Plaintiff has a history of venous insufficiency and wears compression socks "most of the time." R. at 951. However, Plaintiff was not wearing the compression socks during the appointment. R. at 951. X-rays demonstrated no evidence of acute fracture or dislocation on either foot, but

---

[3] The ALJ's partially favorable decision found Plaintiff disabled as of October 21, 2017, based on her change to "advanced age" category on her fifty-fifth birthday, but not before that date. R. at 44. Accordingly, the only relevant period for the purposes of this appeal is the period between Plaintiff's alleged onset date of January 4, 2016, and her date last insured, September 30, 2016. *See* R. at 108. Thus, the Court limits its discussion to the relevant time period.

Plaintiff's left foot demonstrated moderate degenerative changes at the second tarsometatarsal joint. R. at 928–932. Dr. House prescribed Gabapentin. R. at 952. At follow up appointments, Dr. House stated she believed Plaintiff's lower extremity edema was due to venous insufficiency and recommended Plaintiff continue to see a podiatrist for lymphedema wrapping. R. at 949, 946. Although Plaintiff eventually began reporting a work injury that occurred on December 31, 2015, she did not report this injury to Dr. House until May 2016. R. at 939. Upon examination with Dr. House throughout the relevant period, Plaintiff consistently demonstrated a normal gait and full range of motion in both lower extremities. R. at 952, 949, 943. Plaintiff did demonstrate edema in her lower extremities. R. at 946.

Though she did not provide a medical opinion, Dr. House made several comments about Plaintiff's disability claim. Dr. House noted that Plaintiff frequently requested paperwork for her disability claim. R. at 946–47, 949. Dr. House told Plaintiff that she could not just provide a note saying that Plaintiff cannot work, and explained that she would not write Plaintiff any more notes to keep her out of work unless they were for specific doctor's appointments. R. at 947, 949.

Plaintiff also treated with Dr. Brendan McConnell in February and March 2016. R. at 533–34. Dr. McConnell noted that Plaintiff reported no instances of a workplace injury. R. at 533. Upon examination, Dr. McConnell noted moderate edema in Plaintiff's bilateral lower extremities. R. at 534. Dr. McConnell wrapped Plaintiff's legs for about a week which helped with edema in her legs, but the swelling returned thereafter. R. at 534–36, 945. Plaintiff asked Dr. McConnell for notes to excuse her from work. R. at 533. However, Dr. McConnell expressed that Plaintiff's problems "do not appear to be caused by employment." R. at 534.

In March 2016, Plaintiff presented to Dr. Kinjal Sohagia, M.D. complaining of pain in her shoulder, leg, knee, and foot. R. at 545. Although Plaintiff reported that her impairments were

not related to a work injury, she also reported that her leg pain was worse after a work injury occurring on December 31, 2015.  R. at 545.  Dr. Sohagia prescribed a compounding cream, ordered Plaintiff to an MRI, and advised Plaintiff exercise on a regular basis.  R. at 544, 548.

Plaintiff presented to the emergency room twice during the relevant period.  In April 2016, she went to the emergency department with complaints of throbbing lower back pain, bilateral foot pain and swelling, and also reported a right shoulder injury that occurred at work on December 31, 2015.  R. at 918–20.  Plaintiff was discharged in a stable condition, able to ambulate without assistance, and drove herself home.  R. at 921.  Plaintiff presented to the emergency department again in May 2016 for "an injury at work [she got] a while ago" and complained of shoulder and knee pain.  R. at 1441–42.  Upon physician examination, Plaintiff was able to elevate and abduct her right upper extremity to ninety degrees, but felt pain beyond that, as well as pain with resistance.  R. at 1444.  Plaintiff also had mild swelling in her left knee, and pain with range of motion and weight bearing.  R. at 1444.  An x-ray of Plaintiff's left knee showed some degenerative changes with narrowing of the joint space medially and patella. R. at 1444.

In June 2016, Plaintiff treated with Dr. Lara Quinlan for her right shoulder pain associated with her work injury.  R. at 2188–191.  An x-ray of Plaintiff's right shoulder demonstrated no abnormalities, other than minimal early degenerative changes.  R. at 2190.   Dr. Quinlan also ordered an open MRI, and recommended Plaintiff continue Neurontin, ibuprofen and tramadol as needed, and to use Davis compounding cream.  R. at 2192.  Dr. Quinlan later gave Plaintiff a cortisone injection in her right shoulder.  R. at 2197.  Plaintiff reported that the cortisone injection helped her shoulder significantly, although she still had some pain.  R. at 2199.  Dr. Quinlan repeated that  an MRI with complete sedation and intubation was not warranted for her shoulder, "especially when she [was] getting better."  R. at 2202.  Dr. Quinlan ordered an EMG nerve

conduction student of her right upper extremity to evaluate for carpal tunnel. R. at 2203.   Dr. Quinlan also provided Plaintiff with home exercises to help relieve the pain in her knee. R. at 2203.

Despite Dr. Sohagia's MRI order, Plaintiff would not undergo the MRI due to anxiety and fear of closed spaces. R. at 948, 2197. Several of Plaintiff's providers reported they would not continue treatment until Plaintiff underwent an MRI. R. at 942, 945, 1444–46. Dr. House discussed options to ease Plaintiff's MRI-related anxiety, including an open MRI and Xanax such that she could continue treatment. R. at 948, 3255. Plaintiff attempted to obtain an MRI with some sedation, but she had a panic attack and could not get in the MRI machine. R. at 2197. Plaintiff did not receive an MRI during the relevant period. R. at 948, 3255. Plaintiff was also repeatedly advised to wear compression socks, but she did not do so on a regular basis. R. at 945, 946, 942, 951.

As for other measures, Plaintiff attended physical therapy intermittently throughout the relevant period, which helped her some. R. at 939, 2188, 2194. Plaintiff also underwent an endovenous laser ablation, which helped her condition and decreased her lower left extremity edema. R. at 1934–936.

### B. Relevant Medical Opinions by State Agency Examiners

At both the initial and reconsideration levels of review, the state agency examiners found that Plaintiff could perform work at the light exertional level, and that Plaintiff could: stand or walk for four hours in an eight hour workday; sit for about six hours in an eight-hour workday; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and never climb ladders ropes or scaffolds. R. at 85, 116. They also found that Plaintiff was limited in

reaching overhead toward the right, and that Plaintiff would need to avoid moderate exposure to vibration and avoid concentrated exposure to hazards. R. at 86, 117–18.

### C. Plaintiff's Testimony at ALJ Hearings

At the ALJ hearing, Plaintiff testified that she lives with her husband. R. at 3226. Plaintiff is a college graduate, has a degree in business administration, as well as other certifications in hospitality. R. at 3227. Plaintiff is active in her church and has gone on trips with her church in the past. R. at 3229–330. Plaintiff previously worked as a full-time housekeeper at Newport News Behavioral Center before she was injured at work on December 31, 2015. R. at 3231, 3246–51.

Plaintiff testified that she has an amount of pain due to lymphedema that makes it difficult to care for herself. R. at 3268–69. Plaintiff stated that she was able to make her bed because she lives in a one-bedroom apartment, and that she is able to cook, but her husband does the grocery shopping. R. at 3269, 3272, 3275. Plaintiff can stand for about thirty minutes until her back hurts, and she can carry about twelve to thirteen pounds. R. at 3272, 3276. Plaintiff can drive for about three to four hours but stops about every hour for a break. R. at 3278. Plaintiff stated that she sweeps but she cannot vacuum because her legs and knees are painful when she pushes. R. at 3270–71. When asked by the ALJ how Plaintiff spends her day, Plaintiff stated "in the house . . . it's not much to clean but I clean my house." R. at 3270. Plaintiff also stated that she drives during the day, and drives herself to doctor's appointments and physical therapy. R. at 3275, 3278. Plaintiff testified that she wears compression socks daily, but not the ones recommended by Dr. House because they were too expensive. R. at 3279–81.

During the hearing, confusion arose about Plaintiff's other past work history and the lack of a work history report for the ALJ to review. R. at 3235–40. Additionally, confusion arose about certain medical records that appeared to be missing from the record. R. at 3264-67. The ALJ

7

noted that he would keep the record open to allow Plaintiff to clarify her past work experience, and obtain additional medical records. R. at 3242–43, 3264–67, 3294–95.

After the first hearing, Plaintiff submitted her resume and additional medical records to the ALJ. R. at 3120. At the second hearing on March 13, 2019, the ALJ inquired Plaintiff about additional work experience as the owner of a restaurant and the owner and founder of an AM radio station. R. at 3122. The ALJ clarified that transferability of past actual work skills was material to this case. R. at 3127. Plaintiff testified that for several years she owned a Cuban restaurant, where she was responsible for daily operations, and supervised twelve employees. R. at 3133, 3135–37. Plaintiff testified that she did not receive a salary and all the money she earned went back to her business. R. at 3139.

With respect to her experience at the radio station, Plaintiff testified that she was the owner and founder of the program on the radio, and managed a budget of $10,000 annually. R. a 3142. Plaintiff then testified that she did not own the radio station, but was the founder of Nothing But the Truth of God program which played on the radio station. R. at 3143, 3146. A large portion of the hearing was then dedicated to clarifying Plaintiff's role with the radio station. R. at 3142–59. For example, Plaintiff then appeared to testify that she paid the radio station $10,000 to run the program. R. at 3150–51. Plaintiff clarified that she did not work for the radio station but rather acted more as a sponsor. R. at 3151. Plaintiff stated that early on, she interacted with the audience and played music and sermons. R. at 3152.[4]

Plaintiff then testified about her other medical impairments. Plaintiff stated that the use of a compression pump helps keep the swelling in her legs down. R. at 3162. Plaintiff testified

---

[4] Subsequent to the second ALJ hearing, on April 29, 2019, Plaintiff called the Social Security Administration inquiring about her case. R. at 468. According to the note in her file, Plaintiff "said that she never worked for the channels. She said that she was a sponsor for her pastor's radio broadcast. She said that her resume reads the way that it does in an attempt to get employment. R. at 468.

that the neuropathy in her legs causes her more pain 50% of the time, is worse at night, and she only gets about three hours of sleep per night. R. at 3172–74.

### III. THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process. 20 C.F.R. § 404.1520; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (summarizing the five-step sequential evaluation). At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant has an impairment that meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments. § 404.1545(a). At step four, the ALJ considers whether the claimant can still perform past relevant work given her residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ considers whether the claimant can perform other work. § 404.1520(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four. *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014). The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five. *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ

9

will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. R. at 33. At step two, the ALJ found that Plaintiff had the following severe impairments: dysfunction of major joints; peripheral neuropathy; chronic venous insufficiency; osteoarthritis; obesity; and carpal tunnel syndrome. R. at 33. At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 34–35.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, with the following limitations:

> she has been able to frequently but not always balance, only occasionally climb stairs, stoop, kneel crouch, and crawl, and never climb ladders. She has not been able to have no more than occasional exposure to vibration. She has not been able to have more than frequent exposure to extreme humidity and wetness, and to workplace hazards such as unprotected heights or dangerous machinery. She has been able to only occasionally reach overhead with the right arm. She has been able to frequently but not always handle objects (gross manipulation) with the left hand. She has been limited to standing or walking up to four hours total in an 8-hour workday.

R. at 35. In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and 416.929 and SSR 16-3p." R. at 36.

10

At step four, the ALJ determined that Plaintiff was incapable of performing her past relevant work as a housekeeper, which is considered light, and unskilled work, but actually performed at the medium exertional level. R. at 41. The ALJ did not consider Plaintiff's disputed broadcasting and restaurant ownership work in determining Plaintiff's past relevant work. R. at 42. The ALJ determined at step five that since October 21, 2017, Plaintiff has not been able to transfer job skills to other occupations, and accordingly, she has been disabled since that date. R. at 42–44. However, before that date, there were jobs that existed in sufficient numbers in the national economy Plaintiff could have performed, including the representative occupations of information clerk, office helper, and clerical checker. R. at 43–44. Therefore, the ALJ concluded that Plaintiff was not disabled prior to October 21, 2017, but became disabled on that date. R. at 43–44.

## IV. <u>STANDARD OF REVIEW</u>

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Britt v. Saul*, No. 19-2177, 2021 WL 2181704, at *2 (4th Cir. May 28, 2021) (quoting *Craig*, 76 F.3d at 589). The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

Plaintiff's appeal to this Court raises muddled claims that make it difficult for the Court to interpret what specific aspect of the ALJ's decision Plaintiff disputes.[5] *See* ECF No. 21 6–9. Given that lack of clarity, the Court interprets Plaintiff's brief to raise two issues on appeal: (1) whether the ALJ properly evaluated Plaintiff's subjective statements; and (2) whether substantial evidence supports the ALJ's RFC determination.[6] *Id.*

After step three of the sequential analysis, the ALJ must determine the claimant's RFC. § 404.1520(a)(4). RFC is defined as "the most" a claimant "can still do despite [his or her]

---

[5] The Court's role is to determine whether substantial evidence exists in the record to support the Commissioner's final decision, and whether the Commissioner employed the correct legal standard in reaching that decision. 42 U.S.C. § 405(g); *Hays*, 907 F.2d at 1456. Plaintiff's brief in support of her Motion for Summary Judgment does not sufficiently present legal arguments that allow the Court to discern why Plaintiff contends that the Commissioner's decision was not supported by substantial evidence or that the ALJ employed incorrect legal standards. Merely disputing conclusions reached or pointing out potential mistakes of fact does not establish that the decision was not supported by substantial evidence, or that the ALJ applied an incorrect legal standard. *See Hays*, 907 F.2d at 1456. Briefs submitted to this Court should clearly set forth proper legal arguments to allow the Court to sufficiently discern the dispute with the Commissioner's decision.

[6] The Commissioner points out that Plaintiff does not specifically assert a claim of bias by the ALJ, and even if Plaintiff did, then such claim would be waived. ECF No. 24 at 22–23 n.7. Because Plaintiff did not file a reply brief either clarifying a bias claim or contesting the Commissioner's argument that any bias claim is waived, the Court does not interpret Plaintiff's appeal to raise a claim of bias by the ALJ, and any such claim now is waived.

limitations." § 404.1545(a)(1). In making the RFC determination, the ALJ must consider "all the relevant medical and other evidence" in the record and incorporate any impairments supported by objective medical evidence, and those impairments based on the claimant's complaints. § 404.1545(a)(3), 404.1529(a); *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (citing SSR 96–8p, 1996 WL 374184 (July 2, 1996)). In determining the claimant's RFC, the ALJ must "identify the individual's functional limitations" and then assess the individuals "work-related abilities on a function-by-function basis," including the claimant's physical abilities, mental abilities, and any other work-related abilities affected by his or her impairments. *Mascio*, 780 F.3d at 636. The ALJ must include a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* The ALJ also must "build an accurate and logical bridge from the evidence to [the ALJ's] decision" in order to allow the reviewing court to evaluate the ALJ's decision. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

To evaluate a claimant's subjective complaints in the context of an RFC determination, the ALJ must conduct a two-step analysis. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020); §§ 404.1529(a), 416.929(a). At step one, the ALJ must determine "whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce the claimant's alleged symptoms." *Id.* (citing § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). At step two, the ALJ must evaluate the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and perform basic work activities. *Id.* (citing § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4). To evaluate the individual's symptoms, the ALJ looks to whether Plaintiff's subjective complaints could

"reasonably be accepted as consistent with the objective medical evidence and other evidence." *Craig*, 76 F.3d at 595. However, the ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. *Arakas*, 983 F.3d at 95 (citing SSR 16-3p, 2016 WL 1119029 at *5) (internal quotation omitted); *Walker v. Bowen*, 889 F.2d 49, 49 (4th Cir. 1989) ("there need not be objective evidence of the pain itself or the intensity."). Because symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques, at step two, the ALJ must consider the entire case record to assess the limiting effects of the individual's symptoms. *Arakas*, 983 F.3d at 95.

### A. The ALJ Properly Evaluated Plaintiff's Subjective Statements.

Plaintiff appears to contend that the ALJ improperly evaluated Plaintiff's subjective statements, citing to the ALJ's perceived inconsistency between Plaintiff's testimony about her previous work experience and her résumé, and an otherwise "[i]nappropriate tone and accusation by the ALJ. ECF No. 21 at 6–8. In response, the Commissioner argues that the ALJ properly following the correct framework for evaluating Plaintiff's subjective complaints, and that substantial evidence supports the Commissioner's evaluation. ECF No. 24 at 19–24.

Here, the ALJ satisfied the first step of the analysis in considering Plaintiff's subjective complaints by finding that Plaintiff has medically determinable impairments that could reasonably be expected to cause her symptoms. R. at 36. As for step two, the ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [Plaintiff's] symptoms are not fully supported for the reasons explained in this decision." R. at 36. In making this determination, the ALJ considered Plaintiff's testimony about her symptoms, and then the

14

objective medical evidence, Plaintiff's activities of daily living, and the opinion evidence. R. at 36–41.

In evaluating Plaintiff's subjective complaints and RFC, the ALJ noted some evidence of noncompliance by Plaintiff, specifically with obtaining an MRI and use of her compression stockings. R. at 37. The ALJ noted that although the "objective findings indicate abnormalities and she required more than conservative treatment at times," at other times, Plaintiff's physician examinations were unremarkable, she was not always compliant with recommended treatment, and her symptoms improved with treatment. *Id.* For example, in January 2016, her gait was mostly normal, she had a full range of motion in her lower extremities, and x-rays of her right foot were normal, and her left foot demonstrated only moderate degenerative changes. *Id.* (citing R. at 951). Although she complained of bilateral foot pain and swelling, she was not wearing her compression socks and upon examination, she had a normal gait, full range of motion, and unremarkable x-rays. *Id.* Additionally, in February 2016, Plaintiff's nerve testing showed evidence of neuropathy, but, Plaintiff's examiner did not think any restrictions should be imposed on Plaintiff's activity. *Id.* (citing R. at 479–80). The ALJ also noted that Plaintiff reported some improvement from Neurontin. *Id.*

The ALJ pointed out that, Plaintiff discontinued the use of her compression stockings because she believed they were not helping her, and her physician noted that her swelling was most likely caused by venous insufficiency. R. at 38. Plaintiff's physician noted that her condition was permanent, but the swelling and her overall function could be improved with referral to the lymphedema clinic and daily use of the compression stockings. *Id.* Plaintiff again had normal examinations in April 2016 and May 2016, despite some restricted range of motion and a positive Yaegerson and Neers test. *Id.* Again, another provider noted that Plaintiff's x-rays showed no

acute abnormalities. *Id.* Although Plaintiff sought treatment in the emergency room twice, the physical examination findings were either normal or minimal, and Plaintiff was discharged the same day. R. at 39.

As for Plaintiff's activities of daily living, the ALJ explained that while there was "evidence of restriction," Plaintiff "maintained the ability to perform most of her daily activities independently and adequately." R. at 40. For example, the ALJ cited Plaintiff's testimony that she spent most of her day trying to clean up, could sweep, could drive, and participated in activities with her church. *Id.*

Finally, in considering the opinion evidence, in part based on Plaintiff's subjective complaints and activities of daily living, the ALJ found *greater* limitations than those opined by the state agency physicians. R. at 40–41. The ALJ explained that the state agency physicians "only found her limited in her ability to reach overhead with her right arm on no more than a frequent basis, and did not find any problems with the use of her left hand" but the found "that her ability to reach overhead with her right arm would be limited to only occasional, and that her alleged arthritis would affect her ability to handle objects with her left hand." R. at 41. Thus, the ALJ sufficiently considered Plaintiff's subjective complaints in the two-step analysis, and substantial evidence supports the ALJ's determination that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully supported by the evidence in the record.

Plaintiff's statements to the contrary are either inconsequential or inaccurate. Plaintiff appears to argue that: (1) the ALJ applied an incorrect legal standard by not considering Plaintiff's credibility, and improperly "expressed irritation with Plaintiff due to a perceived inconsistency in Plaintiff's resume," and (2) that the ALJ overstated Plaintiff's testimony about her ability to clean.

16

ECF No. 21 at 6–8. First, as explained above, the ALJ applied the correct legal standard in evaluating Plaintiff's subjective complaints. As correctly explained by the Commissioner, the Social Security Administration no longer uses the term "credibility," but ALJs still use the same regulatory framework to assess a claimant's statements about his or her symptoms and complaints. *See Taylor v. Saul*, No. 419cv1254, 2020 WL 3549167, at *7 (D.S.C. June 3, 2020) (nothing that "[a]lthough SSR16-3p eliminates usage of the term "credibility" because the regulations do not use the term, the assessment and evaluation of Plaintiff's symptoms requires usage of most of the same factors considered under SSR96-7p."), *report and recommendation adopted*, No. cv 4:19-1254, 2020 WL 3548264 (D.S.C. June 30, 2020). Here, the ALJ properly considered Plaintiff subjective complaints in connection with the objective medical evidence, Plaintiff's activities of daily living, and the opinion evidence. R. at 41. Additionally, the ALJ made no mention of the "perceived inconsistencies" between Plaintiff's testimony and her resume in evaluating Plaintiff's subjective complaints. *See* R. at 35–41. Rather, the ALJ only mentioned the "perceived inconsistency" in evaluating Plaintiff's past relevant work at step four, and even then the ALJ concluded that Plaintiff's past work experience in broadcasting and owning a restaurant in Plaintiff's favor and *not* past relevant work. *See* R. at 41–42.

Second, Plaintiff's contention that the ALJ overstated her ability to clean is belied by the record. During Plaintiff's first ALJ hearing, the ALJ asked "So how do you spend your day? You're watching television? In bed? What do you do?" R. at 3270. Plaintiff responded, "it's not much to clean, but I clean my house." R. at 3270. Plaintiff also represented in a function report that she cleans frequently throughout the day. R. at 2401. Accordingly, the ALJ did not mischaracterize Plaintiff's testimony about her ability to clean.

In sum, the ALJ applied the correct legal standard in evaluating Plaintiff's subjective complaints, and substantial evidence supports the ALJ's conclusion.

**B.  Substantial Evidence Supports the ALJ's RFC Determination.**

Plaintiff also appears to argue that substantial evidence does not support the ALJ's RFC determination. ECF No. 6–10.  Plaintiff states that "the ALJ states Plaintiff did not experience edema, restricted ROM or antalgic gait prior to her [date last insured]," and states that the ALJ did not cite to other records which would support a finding that Plaintiff has an antalgic gait. ECF No. 21 at 6.  In response, the Commissioner argues that the ALJ properly evaluated Plaintiff's RFC and that substantial evidence supports the ALJ's conclusion.  ECF No. 24 at 20–24.

As explained in detail above, and incorporated herein, the ALJ reviewed the entirety of the medical evidence, including Plaintiff's testimony, the objective medical evidence, Plaintiff's activities of daily living, and the opinion evidence to determine Plaintiff's RFC.  In formulating Plaintiff's RFC, the ALJ recognized that "objective medical findings indicate abnormalities and she required more than conservative treatment at times."  R. at 37.  However, the ALJ conducted a function-by-function analysis in determining that Plaintiff had the RFC to perform light work with additional limitations, stating:

> Nonetheless, the medical findings support a [RFC] for light work.  Her shoulder issues warrant further limitations on reaching overhead with her right arm, and alleged arthritis warrants further limitations on her ability to handle objects with her left hand.  Her knee and back issues support an additional limitation on her ability to stand and/or walk, as a well as perform postural movements like climb, stoop, kneel, crouch, and crawl.  Her obesity also limits her ability to perform postural movements and have exposure to vibration and weather extremes.  While she alleged some balance issues, she was largely found to have a normal gait.  There were a few instances when she had some problems with balance; therefore, I have f[o]und that she can balance on a frequent basis.

R. at 37.  Thus, the ALJ conducted a function-by-function analysis and explained why the medical evidence supported his RFC determination.  *See* R. at 37.

18

Again, Plaintiff's argument to the contrary are unavailing.  Plaintiff contends that the ALJ "states Plaintiff did not experience edema, restricted [range of motion] or antalgic gait prior to her [date last insured]," and takes issue that the ALJ did not cite to exhibits 21F or 24F.[7]  ECF No. 21 at 6.  First, the Court notes that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [his or her] decision." *Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019) (quoting *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)).  Thus, absent any argument explaining why the failure to cite to any specific record was detrimental to the ALJ's decision, the ALJ did not err by failing to cite to any specific record identified by Plaintiff.

Second, Plaintiff does not cite, and the Court cannot locate, where, according to Plaintiff, "the ALJ states that Plaintiff did not experience edema, restricted range of motion, or antalgic gait prior to the date last insured." ECF No. 21 at 6.  To the contrary, the ALJ made several references to evidence of Plaintiff's edema.  R. at 38 (referring to Plaintiff's complaints of worsening lower extremity swelling, continued complaints of bilateral lower extremity swelling, a provider's reference to her edema as a permanent condition, her emergency room visit seeking treatment for lower extremity swelling).  The ALJ also referenced findings of a restricted range of motion.  *Id.* (noting that Plaintiff's right shoulder had some restricted range of motion with back each movement; R. at 39 (referencing Plaintiff's pain with range of motion).

As for Plaintiff's gait, the ALJ noted evidence that Plaintiff appeared to have a normal gait upon examination.  R. at 37 (noting that although Plaintiff had some balance issues, she was largely found to have a normal gait, evidence of Plaintiff's examinations showing a normal gait); R. at 38 (noting Plaintiff's examination demonstrated a normal gait); R. at 39 (referencing Plaintiff's

---

[7] The Court notes that Exhibit 21F and Exhibit 24F total 439 pages, and it is not exactly clear why Plaintiff believes these records support her claim, especially considering many of the records contained therein are duplicates of records the ALJ did cite.  Nonetheless, Plaintiff does provide some specific citation to the record and the Court focuses on those specific citations provided by Plaintiff.

difficulty walking and noting that she appeared to be using a cane). While Plaintiff does cite one record before Plaintiff's date last insured referencing that Plaintiff was walking with an antalgic gait (ECF No. 21 at 6 (citing R. at 2202)) in support of her contention that the ALJ failed to cite certain records, another record from two days later that Plaintiff cites in support of her contention notes that Plaintiff had a normal gait (ECF No. 21 at 6 (citing R. at 1207)). A single noted instance of an antalgic gait within the relevant period does not render the ALJ's statement that Plaintiff was "largely found to have a normal gait," error. R. at 37.

Accordingly, the ALJ's robust explanation of Plaintiff's RFC, especially considering the evidence before the date last insured, provides substantial evidence for the ALJ's conclusion.

## VI.  **RECOMMENDATION**

Because substantial evidence supports the Commissioner's decision and the correct legal standard was applied, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 20, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 23, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII.  **REVIEW PROCEDURE**

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

20

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Newport News, Virginia
February 8, 2022

21